In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

No. 70–347.

United States District Court, E. D. Pennsylvania.

Aug. 31, 1973.

Robert W. Blanchette, Robert Lipkin, Ivan Shomer, and Carl Helmetag, Jr., Philadelphia, Pa., for the Trustees, Penn Central Trans. Co.

David Berger, P. A. by David Berger, Michael K. Simon, Harold Berger and Paul Joseph McMahon, Philadelphia, Pa.,

Alan S. Fellheimer, Philadelphia, Pa., for Girard Trust Bank, indenture trustee.

Frederic L. Ballard, Philadelphia, Pa., for Institutional Investors, Penn Central Group.

Gratz, Tate, Spiegel, Ervin & Ruthrauff, by Wilbur Bourne Ruthrauff, Philadelphia, Pa., for Richard Joyce Smith, trustee, New York, New Haven & Hartford RR. Co.

Davis, Polk & Wardwell, by Richard M. Berman, New York City, for Morgan Guaranty Trust Co. of New York.

O'Melveny & Myers, by Warren Christopher, Los Angeles, Cal., for Pennsylvania Co.

Wolf, Block, Schorr & Solis-Cohen, by Michael Temin, Philadelphia, Pa., for First Pennsylvania Banking & Trust Co.

## MEMORANDUM AND ORDER NO. 1307

FULLAM, District Judge.

The Trustees seek approval of a proposed contract with Victor Palmieri and Company, Incorporated (hereinafter referred to as "the Managers") relating to the management, development, and marketing of the Debtor's interests in non-operating real estate. The proposed agreement is not objected to by the Institutional Investors and the Indenture Trustees. It is actively opposed by the Penn Central Company, the owner of the Debtor's common stock. The New Haven Trustee has questioned certain features of the proposed agreement, but has not expressed objection to the general concept embodied therein.

There is no dispute about the existence of the basic problems which this agreement is intended to solve. The Debtor owns outright, or has extensive interests in, a vast amount of real property not needed for railroad operations. These holdings are diverse and far-flung. The aggregate value of these holdings may be as much as $1 billion or more. Much of this real estate produces substantial income for the Debtor's estate. A substantial part of this real estate is now nonproductive, but could be made to produce substantial income, or could be developed and sold at enhanced values, through proper management. Approximately $200 million worth of this real estate appears unlikely to increase significantly in value, or to produce substantial income, and should properly be sold through a careful marketing program.

Unless some improvement is made promptly in the handling of this gigantic real estate portfolio, there is a serious likelihood that much of the property will decline in realizeable value, either because of inadequate policing of tenants and fixing and collecting rents, deterioration of buildings or a variety of other reasons.

To prevent such losses, and to preserve and enhance the values of the Debtor's real assets, it is necessary for the Debtor to incur substantial additional costs, for additional manpower, computerization, surveys and title examinations, and a marketing program. The question naturally arises as to whether the task should be performed entirely within the existing corporate structure of the railroad, or under the supervision of an outside firm.

The Trustees have opted for the latter, on the theory that it would be easier for such a firm to acquire the caliber of personnel with the specialized skills that would be required, and that the neces-

sary development and marketing programs would be more likely to succeed if managed by a separate entity, divorced insofar as permissible from the railroad business and the stigma of bankruptcy.

In recognition of these goals, the Trustees proposed Plan of Reorganization, and other plans now pending before the Interstate Commerce Commission, contemplate that at some point a separate real estate development corporation will be formed and will acquire title to, and creatively develop and manage, the non-operating real estate. Whether this feature will in fact be included in whatever plan of reorganization is finally approved is, of course, impossible to state at this time. But it is altogether clear, and indeed undisputed, that a program of expenditures such as those proposed in the first phase of the agreement under consideration will be necessary in order to preserve and enhance the values of the Debtor's estate, no matter what the final result of the reorganization proceedings may be.

Under the terms of the proposed agreement, the Managers would assume responsibility for the entire "portfolio" of non-operating real estate. They would be given an annual budget, and would make quarterly reports of progress and expenditures. Within the budgeted limits, the Managers would be expected to recruit appropriate additional personnel, and contract for the necessary consulting services. In addition to these out-of-pocket expenses, the Managers would be paid a management fee of $150,000 per annum, plus 1 percent on all real estate sales in excess of $15 million annually. (Stated otherwise, the management fee would be 1 percent of all real estate sales, with a guaranteed minimum of $150,000.)

The budget for the first year would be $4.5 million consisting of $2,850,000 in "start-up" costs, and $1,975,000 in operating costs (the "start-up" costs include, principally, costs for title examinations and accounting and data processing).

Under the terms of the proposed agreement, the Trustees would be obligated to carry out the contract until the new real estate company was formed, and would be required to see to it that the new real estate company thereafter continued to carry out the agreement. The agreement provides, however, that if for any reason the separate real estate company does not commence operations, the Trustees may terminate the contract after three years. And, of course, the contract is terminable at any time, if the Managers fail to fulfill their obligations under the agreement.

█ It is not the function of this Court to second-guess the business judgments of the Trustees, particularly when they are concurred in by the secured creditors who presumably have, in a very real sense, the most substantial interest in the assets being dealt with. Nevertheless, the Court must be satisfied that the proposed exercise of business judgment will not improperly infringe upon the rights of any of the parties in interest, will not adversely affect the ability of the Debtor to reorganize, will not interfere with the ability of the Interstate Commerce Commission to carry out its reorganization functions, and will not contravene any ruling principle of law.

In the Matter of Penn Central Transportation Company, Debtor, 484 F.2d 323 (3d Cir. 1973, rehearing denied July 23, 1973), a majority of the Court of Appeals appears to have held that there are some kinds of "substantial" sales of real estate which may not be carried out by Trustees under § 77(o) of the Bankruptcy Act, but must await the adoption and consummation of a final plan of reorganization. The precise extent to which this ruling would preclude sales of individual parcels is not entirely clear (for years, both before and since reorganization, the Debtor has routinely disposed of non-essential real estate at a rate averaging $30 million annually). There is, presumably, still some room for sales of parcels in the ordinary

course of business. Be that as it may, I do not believe it can be reasonably asserted that the Court of Appeals intended to prohibit the carrying out of preliminary steps in preparation for such sales, or even for a comprehensive divestiture program.

Under the proposed agreement, unless and until the separate real estate entity is set up in accordance with a reorganization plan which has been considered by the ICC and approved by this Court, the final decision as to whether particular sales shall occur would remain with the Trustees and this Court, subject to appellate review. Thus, there is no merit to the argument of the Penn Central Company that, because the Managers' compensation is contingent upon sales, the proposed agreement would be inconsistent with any form of reorganization which did not contemplate large-scale dispositions. In the first place, as noted above, the Managers do not contemplate recommending immediate sales except for certain properties where that course appears appropriate (sales which, presumably, would be permissible under the Third Circuit's ruling). In the second place, and more importantly, no sales can occur in violation of the ruling of the Court of Appeals.

The proposed agreement would not have any adverse effect upon the ability of the Interstate Commerce Commission to formulate and recommend its proposed plan of reorganization. The work in question would have to be done irrespective of the final outcome of the reorganization proceedings, and would be equally beneficial no matter which of the various possible alternatives may come to pass.

A more difficult question is the advisability of undertaking this additional expense at a time when it appears that, in the absence of outside financial support, the Debtor's continued rail operations at substantial losses are likely to result in unconstitutional erosion of the Debtor's estate, and are likely to become simply impossible in any event, for lack of operating cash. For two reasons, I have concluded that there is no justification for postponing the inception of this necessary program. (1) In the context of the Debtor's cash needs, the amount involved is relatively small. It represents less than one day's revenues; or, to put it another way, in the absence of federal funding to support deficit operations while Congress works out its solution to the Northeast rail crisis, and if the Debtor as a consequence is forced to terminate rail service for lack of cash, the amount of cash here involved would not alter the date of shutdown by more than one month. (2) In reality, the ultimate issue in this connection is whether the proposed program should be financed from operating revenues (*i. e.*, income from real property which is now being devoted exclusively to rail operations), or from the escrowed proceeds from real estate sales (not now available for operating expenses). In advancing their proposal, the Trustees have expressly reserved the right to assert at a later date that the entire cost of the program should be financed from the proceeds of property sales. Thus, present approval of this agreement does not foreclose a later restoration to operating funds if that becomes necessary and is held to be legally appropriate.

■ I have therefore concluded that the proposed agreement, in its broad outlines, should be approved. I find persuasive support for this conclusion in Exhibit T–2, and in the testimony of Victor Palmieri. I recognize, as do the Trustees, that the existing personnel in the Debtor's Real Estate Department are highly competent, and have done a truly commendable job under extremely adverse circumstances. They are, however, admittedly hampered by the lack of staff and adequate financial support. If the Debtor were not in bankruptcy, it might well be feasible to achieve the results here sought by merely increasing the budget of the Real Estate Depart-

ment, centralizing all decision-making within the Department, and attempting to isolate the decision-making process from traditional Operating Department controls. But I am not persuaded that the Trustees' business judgment, to the effect that, because of the pendency of reorganization proceedings, better results are likely to be obtained by following the course proposed by the Trustees, is erroneous.

There remain, however, some features of the proposed contract which require clarification and redrafting. The form of agreement submitted at the hearing (as amended in accordance with statements made at the hearing) is not sufficiently clear that the expiration date (in the event the new real estate company does not commence operations) is three years from July 2, 1973. The contract should be further revised to make clear that the budget therein set forth includes all payroll and other overhead expenses of the Managers. It should be made clear that the Trustees are incurring no present obligation to make additional capital expenditures. And, while I recognize that the Managers are entitled to some assurance that, after the new real estate company is formed, the Managers will not be deprived of the fruits of their development activities through premature termination of their contract, consideration should be given to providing such assurance otherwise than through a seemingly perpetual agreement. And finally, I do not believe the form of agreement proposed (which is obviously motivated by a desire to have the benefit of the demonstrated and undeniable expertise of Victor Palmieri himself) is sufficiently clear as to what would occur if, for any reason, Mr. Palmieri's availability to provide supervision should terminate.

The Trustees will be required to submit a revised form of agreement, and a revised form of final order for approval. No further hearings will be required.